FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Aug 26, 2026

SEAN F. MCAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PAUL S.,[1]<br><br>Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO, COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | No. 1:26-cv-03047-RLP<br><br>ORDER REVERSING AND REMANDING THE COMMISSIONER'S DECISION FOR FURTHER ADMINISTRATIVE PROCEEDINGS |

BEFORE THE COURT is an appeal from an Administrative Law Judge (ALJ) final decision denying disability benefits under Title II and supplemental security income under Title XVI of the Social Security Act. The Court considered the matter without oral argument.

For the reasons discussed below, the Court concludes the ALJ erred in assessing Mr. S.'s symptom testimony and reverses and remands the case for

[1] The court identifies a plaintiff in a social security case only by the first name and last initial in order to protect privacy. *See* LCivR 5.2(c).

additional proceedings. Therefore, Mr. S.'s brief, ECF No. 7, is granted, and the Commissioner's brief, ECF No. 9, is denied.

## BACKGROUND

Mr. S. was born in 1982. Tr. 41. He attended school through the eleventh grade and has no past relevant work. Tr. 41, 62.

On July 17, 2023, Mr. S. applied for Title II and Title XVI disability benefits, alleging an onset date of March 15, 2015, based on Post-Traumatic Stress Disorder (PTSD) and attention deficit disorder (ADD). Tr. 83, 241, 248, 275. His date last insured for purposes of his Title II claim was March 31, 2020. Tr. 33. The claims were denied initially and upon reconsideration. Tr. 31.

Mr. S. requested a hearing, which was held in August 2025. Tr. 31, 49-84. He appeared with a non-attorney representative and testified at the hearing. Tr. 31, 49-80. A vocational expert also testified. Tr. 49-50, 77-80. The ALJ denied Mr. S.'s claims on September 9, 2025. Tr. 31-43. The Appeals Council denied review. Tr. 1-6. Mr. S. now appeals to this Court pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

## STANDARD OF REVIEW

A district court's review of a final decision of the Commissioner of Social Security is governed by 42 U.S.C. § 405(g). The scope of review under § 405(g) is limited; the Commissioner's decision will be disturbed "only if it is not supported by substantial evidence or is based on legal error." *Hill v. Astrue*, 698 F.3d 1153,

1158 (9th Cir. 2012). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n.10 (9th Cir. 1975). If the evidence in the record "is susceptible to more than one rational interpretation, [the Court] must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

Further, a district court "may not reverse an ALJ's decision on account of an error that is harmless." *Id*. An error is harmless "where it is inconsequential to the [ALJ's] ultimate nondisability determination." *Id*. at 1115 (quotation and citation omitted). The party appealing the ALJ's decision generally bears the burden of establishing that it was harmed. *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).

## FIVE-STEP EVALUATION PROCESS

A claimant must satisfy two conditions to be considered "disabled" within the meaning of the Social Security Act. First, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Second, the claimant's impairment must be "of such severity that he is not only unable to do [his or her] previous work[,] but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42

U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step sequential analysis to determine whether a claimant satisfies the above criteria. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). At step one, if the claimant is engaged in "substantial gainful activity," the Commissioner must find that the claimant is not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, the Commissioner considers the severity of the claimant's impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant suffers from "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities," the analysis proceeds to step three. 20 C.F.R. §§ 404.1520(c), 416.920(c). At step three, the Commissioner compares the claimant's impairment to severe impairments recognized by the Commissioner to be so severe as to preclude a person from engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the severity of the claimant's impairment does not meet or exceed the severity of the enumerated impairments, the Commissioner must assess the claimant's residual functional capacity (RFC), which is the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her limitations, 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

At step four, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing work that he or she has performed in the

past (past relevant work). 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If not, the analysis proceeds to step five and the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing other work in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The claimant bears the burden of proof at steps one through four above. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the analysis proceeds to step five, the burden shifts to the Commissioner to establish that (1) the claimant is capable of performing other work; and (2) such work "exists in significant numbers in the national economy." 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2); *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).

## ALJ'S FINDINGS

At step one, the ALJ found Mr. S. had not engaged in substantial gainful activity since March 15, 2015, the alleged onset date. Tr. 33.

At step two, for purposes of Mr. S.'s Title II claim, the ALJ found that before his date last insured of March 31, 2020, the record contained no medical signs or laboratory findings substantiating a medically determinable impairment. Tr. 33-35. The ALJ further found that, even if Mr. S. had medically determinable mental impairments before his date last insured, the record did not establish more than minimal work-related limitations for twelve continuous months, and the impairments therefore would have been nonsevere. Tr. 34-35. The ALJ accordingly denied the Title II claim at step two. Tr. 35. Alternatively, the ALJ

found that even if Mr. S.'s impairments were severe before his date last insured, the residual functional capacity set forth later in the decision would account for the limitations supported by the record and the Title II claim would still be denied at step five. *Id*.

For the period beginning on Mr. S.'s July 17, 2023, protective filing date, the ALJ found the following severe impairments: major depressive disorder, PTSD, substance use disorder, bipolar disorder, and generalized anxiety disorder. *Id*. The ALJ found that Mr. S.'s reported seizures, knee and lower-back pain, and impairments related to being shot in the head did not constitute medically determinable impairments and, alternatively, were not severe. *Id*.

At step three, the ALJ found Mr. S. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. 35-36. In assessing paragraph B criteria, the ALJ found moderate limitations in understanding, remembering, or applying information and in concentrating, persisting, or maintaining pace, and mild limitations in interacting with others and adapting or managing oneself. Tr. 36.

Before proceeding to step four, the ALJ found Mr. S. had the residual functional capacity (RFC) "to perform work that consists of simple tasks and that is short cycle." Tr. 36. In assessing the RFC, the ALJ considered several medical opinions and prior administrative medical findings. He found persuasive the Division of Disability Determination Services (DDS) psychological

reconsideration finding that Mr. S. could understand and remember short and simple instructions. Tr. 39. He found the May 2023 opinion of examining psychologist Thomas Genthe, Ph.D., which assessed marked and severe mental limitations, not persuasive, and likewise found the opinion of reviewing psychologist Luci Carstens, Ph.D., P.S., who concurred with Dr. Genthe, not persuasive. Tr. 40. The ALJ found PMHNP Cheryl Crane's June 2024 opinion generally persuasive, but treated Mr. S.'s reported marked problems handling workplace pressure as part of her opinion and found that portion not persuasive. Tr. 40.

At step four, the ALJ found Mr. S. had no past relevant work. Tr. 41. At step five, the ALJ found that jobs existed in significant numbers in the national economy that Mr. S. could perform, including laborer, stores; machine packager; and cleaner II. Tr. 41-42. Based on these findings, the ALJ determined Mr. S. had not been disabled from the alleged onset date, March 15, 2015, through the date of the decision. Tr. 42.

## DISCUSSION

Mr. S. contends the ALJ erred by failing to fully and fairly develop the record, improperly evaluating his symptom testimony, and improperly evaluating the medical opinion evidence. The Court agrees that the ALJ committed reversible errors and finds that further administrative proceedings are necessary. Mr. S.'s arguments are addressed in turn.

1. Duty to Develop the Record

Mr. S first contends the ALJ failed to fully and fairly develop the record because he failed to obtain six categories of potentially relevant evidence. He argues those records could undermine the ALJ's findings that he had no medically determinable impairment before his date last insured, had no severe physical impairment after his application date, and required no additional limitations in the residual functional capacity. The Commissioner responds that the record was neither ambiguous nor inadequate, pointing to 381 pages of medical evidence dating to July 2015 and multiple medical opinions. Mr. S. replies that the volume of the record does not establish that it was complete.

The Court agrees with the Commissioner and concludes the ALJ did not have a duty to further develop the record.

a. Legal Principles

The claimant bears the burden of proving disability and must inform the agency about or submit evidence relevant to his claim. 20 C.F.R. §§ 404.1512(a), 416.912(a). But an ALJ has an independent duty to fully and fairly develop the administrative record. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). Ambiguous evidence, or the ALJ's own finding that the record is inadequate to permit proper evaluation of the evidence, triggers the duty to conduct an appropriate inquiry. *Id.* "A specific finding of ambiguity or inadequacy of the record is not necessary to trigger this duty to inquire, where the record establishes

ambiguity or inadequacy." *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011). But "speculation as to the existence of outstanding material records is not sufficient to show that the record before the ALJ was inadequate and that the ALJ therefore had a duty to further develop the record." *Larkin v. Berryhill*, No. C17-1689-BHS-JPD, 2018 WL 4103253, at *6 (W.D. Wash. June 22, 2018), *aff'd sub nom*. *Larkin v. Saul*, 819 F. App'x 535 (9th Cir. 2020).

The ALJ must be especially diligent when the claimant is unrepresented or represented only by a lay representative, and the duty is heightened where the claimant may be mentally ill and unable to protect his own interests. *Tonapetyan*, 242 F.3d at 1150; *Higbee v. Sullivan*, 975 F.2d 558, 562 (9th Cir. 1992).

Once the duty is triggered, the ALJ may develop the record by, among other things, subpoenaing physicians, submitting questions to physicians, continuing the hearing, or keeping the record open to permit supplementation. *Tonapetyan*, 242 F.3d at 1150.

A claimant asserting that the ALJ failed to develop the record must also show prejudice from the error. *McLeod*, 640 F.3d at 887. Remand is appropriate when the circumstances show a substantial likelihood of prejudice; a mere probability of prejudice is insufficient. *Id.* at 888.

b. Application

Mr. S. identifies six categories of evidence that he contends the ALJ should have obtained: records from two scheduled consultative examinations, correctional

treatment records, records from the hospital where Mr. S. reportedly sought treatment two days after being shot in the head, records from Sundown M Ranch, and additional records from Yakima Neighborhood Health Services (YNHS). Each is discussed in turn.

First, Mr. S. contends the ALJ failed to investigate whether he attended the January 2024 psychological consultative exam with PMHNP Crane and whether the exam generated any documentation. The record contains some inconsistency. The initial-level Disability Determination Explanations state that Mr. S. failed to attend the January 2024 exam. Tr. 85, 92. Likewise, the index listing for PMHNP Crane's consultative exam states "CE No Show." Index Exhibit No. 9F. However, the initial-level Disability Determination Explanations also contain Mr. S.'s representative's report that Mr. S. appeared, became loud, was asked to leave, and did not complete the exam. Tr. 85, 92.

The record does not, however, indicate that a completed examination report or other documentation from the January appointment existed but was not obtained. The record contains the authorization and invoice for PMHNP Crane's examination, but that document does not indicate that an examination was completed or that any findings resulted. *See* Tr. 598. The evidence logs accompanying the initial determinations also reflect a response from PMHNP Crane indicating "No Records/Not Patient." Tr. 84, 91. And the initial denial notices for Mr. S.'s claims likewise state that the Social Security Administration

"received a response indicating no records" from PMHNP Crane. Tr. 120, 125. And to the extent Mr. S. relies on the reported incident where he became loud and was asked to leave as evidence of impaired social functioning, that evidence was already before the ALJ through his representative's report. Tr. 85, 92.

The record was also developed further at reconsideration. PMHNP Crane completed a psychological consultative examination in June 2024. Tr. 98, 105; *see also* Tr. 644-47. The ALJ considered that examination and found PMHNP Crane's opinion generally persuasive. Tr. 39-40. Accordingly, Mr. S. has not shown that the January appointment left the record inadequate for adjudication or that further inquiry into that appointment carried a substantial likelihood of changing the disability determination.

Second, Mr. S. contends the ALJ failed to investigate whether Oscar Del Valle, ARNP, completed a physical consultative exam and lumbar x-rays in June 2024. He relies on Tr. 648, which lists authorized services and billed amounts for a general medical exam and lumbar imaging. But Tr. 648 is an authorization for those services and an invoice, and does not indicate the services were performed or that any findings resulted. *See* Tr. 648.

The index listing for ARNP Del Valle's consultative exam states "CE No Show." Index Exhibit No. 13F. The reconsideration Disability Determination Explanations also state that Mr. S. failed to appear for the physical consultative exam, agreed to attend a rescheduled exam with transportation, and again failed to

appear. Tr. 99, 106. The evidence logs accompanying those reconsideration determinations reflect a response from ARNP Del Valle indicating "No Records/Not Patient." Tr. 98, 105. And the reconsideration denial notices likewise state that the Social Security Administration "received a response indicating no records" from ARNP Del Valle. Tr. 131, 135.

Thus, the record does not establish that examination report or lumbar x-rays by ARNP Del Valle existed but were not obtained. At most, Mr. S. speculates that such records may exist based on the authorization and invoice at Tr. 648. That speculation is insufficient to establish that the record before the ALJ was inadequate. Mr. S. also has not shown a substantial likelihood that further inquiry concerning the ARNP Del Valle appointment would have changed the disability determination.

Third, Mr. S. contends the ALJ failed to obtain Department of Corrections records. The record reflects several periods of incarceration. In August 2018, Mr. S. reported that he had recently been jailed four times. Tr. 682. In March 2019, he reported that he had recently been released from jail. Tr. 352. A June 2020 Comprehensive Healthcare record states that an appointment was canceled because Mr. S. remained incarcerated and his housing unit was under a COVID-19 lockdown. Tr. 381. The record also contains Comprehensive Healthcare records from jail-specific re-entry and discharge-planning contacts in 2023. Tr. 515-16, 540-41. Mr. S. argues that correctional records likely contain information

concerning medications, mental or physical care, and behavioral problems, including during the period before his date last insured.

The record, however, does not identify medical or mental health treatment Mr. S. received from a correctional provider that was not obtained. The August 2018 YNHS record and March 2019 Comprehensive Healthcare assessment document his incarceration and condition following release, but neither indicates that he received medical or mental health treatment while incarcerated. Tr. 352, 682-84. The June 2020 record establishes only that Mr. S. remained incarcerated at that time. Tr. 381. And although Comprehensive Healthcare provided jail-specific re-entry and discharge-planning services in 2023, those records do not identify additional correctional treatment records. Tr. 515-16, 540-41.

Thus, Mr. S.'s assertion that additional correctional records likely contain relevant medical, mental health, or behavioral evidence is speculative. The record establishes periods of incarceration but does not otherwise indicate that additional correctional treatment records exist. Mr. S. therefore has not shown that the absence of correctional records rendered the record inadequate for adjudication or resulted in a substantial likelihood of prejudice.

Fourth, Mr. S. contends the ALJ failed to obtain records from the hospital he reportedly visited after being shot in the head. He argues the missing records are relevant because the ALJ found no medically determinable impairment associated with the shooting and included no limitations related to his headaches.

The record is ambiguous as to whether Mr. S. sought hospital treatment after the shooting. Mr. S.'s representative stated at the hearing that he "never went to the hospital" after the shooting. Tr. 57-58. The ALJ repeated that understanding, and the representative confirmed it. Tr. 59. Mr. S. later testified, however, that he went to a hospital two days after the shooting because his head was hurting badly. Tr. 72. He similarly reported in January 2024 that he went to a hospital after the shooting, received an x-ray, and was released. Tr. 579.

Even assuming this ambiguity triggered the ALJ's duty to inquire further, Mr. S. has not shown a substantial likelihood of prejudice. The record documents complaints of headaches, including a "level-10" headache in November 2023 and Mr. S.'s later report of headaches related to the gunshot wound. Tr. 564, 568, 645. Those records do not identify a diagnosed impairment or work-related limitation attributable to the shooting. Tr. 564, 568, 645. Mr. S. also described the injury as "not serious" and the hospital treatment as limited to an x-ray and release. Tr. 579. Accordingly, Mr. S. has not shown a substantial likelihood of prejudice from the ALJ's failure to obtain records from the unidentified hospital.

Fifth, Mr. S. contends the ALJ failed to obtain treatment records from Sundown M Ranch. The record indicates that Mr. S. received substance use treatment at Sundown before his March 31, 2020, date last insured. Tr. 353, 442. In March 2019, Mr. S. reported that he had previously received treatment at Sundown, remained sober for about a year, and then relapsed. Tr. 353. In February

2021, he reported that he had received inpatient treatment at Sundown approximately two years earlier, followed by intensive outpatient treatment. Tr. 442. There is no indication that those records were requested.

The existing references to Sundown in the record identify the treatment as substance use treatment and do not indicate that Sundown treated other impairments or assessed work-related functional limitations. Tr. 353, 442. The record otherwise documents Mr. S.'s pre-DLI history of substance use, including an August 2018 diagnosis of alcohol abuse. Tr. 682-84. Accordingly, the absence of the Sundown records does not establish that the record was inadequate for adjudication, and Mr. S. has not shown a substantial likelihood of prejudice from their absence.

Sixth, Mr. S. contends the YNHS records are incomplete because the record contains only one YNHS treatment note from August 2018 and no records from his non-attorney representative, who stated at the hearing that she had known Mr. S. since 2017 and was *a* case manager with YNHS. Tr. 60, 682-84.

But the record shows that YNHS was specifically asked in July 2025 to provide all physical and behavioral-health records from March 15, 2014, through the present. Tr. 672. YNHS responded that it had enclosed "ALL the information" it was permitted to disclose pursuant to Mr. S.'s authorization. Tr. 677. And the non-attorney representative did not state that she had served as *Mr. S.'s* YNHS case manager since 2017 or that she had created treatment records concerning him.

Tr. 60. Thus, Mr. S.'s assertion that additional YNHS records exist is speculative and does not establish that the record before the ALJ was inadequate.

All considered, the Court concludes Mr. S has not shown that the ALJ had a duty to develop the record any further.

### 2. Symptom Testimony

Mr. S. next argues the ALJ improperly discounted his symptom testimony. He contends the specific, clear, and convincing standard applies because the record contains no affirmative evidence of malingering and that the ALJ failed to provide sufficient reasons for discounting his allegations. The Commissioner disagrees on both points. The Court agrees with Mr. S.

#### a. Legal Principles

An ALJ must conduct a two-step analysis to determine whether to discount a claimant's testimony regarding subjective symptoms. SSR 16-3p, 2017 WL 5180304, at *3. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Molina*, 674 F.3d at 1112 (citation modified). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).

"The clear and convincing standard is the most demanding required in Social

Security cases." *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). General findings are insufficient; rather, the ALJ must identify what symptom claims are being discounted and what evidence undermines these claims. *Ghanim*, 763 F.3d at 1163 (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring the ALJ to sufficiently explain why he or she discounted claimant's symptom claims).

b. Affirmative Evidence of Malingering

As a threshold matter, Mr. S. argues that the specific, clear, and convincing standard applies because the ALJ did not find that he was malingering. The Commissioner responds that an express finding of malingering is unnecessary where the record contains affirmative evidence suggesting malingering.

The Ninth Circuit has expressly rejected the proposition that an ALJ must make a specific finding of malingering before the clear and convincing standard ceases to apply. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160 & n.1 (9th Cir. 2008). Rather, the clear and convincing standard does not apply where the record contains affirmative evidence suggesting malingering. *Id*. Here, the ALJ did not find that Mr. S. was malingering.

The question, then, is whether the record nevertheless contains affirmative evidence suggesting malingering. On this question, the parties dispute whether the results of the Personality Assessment Inventory (PAI) administered by examining

psychologist Dr. Genthe, constitute affirmative evidence of malingering.

The PAI's Clinical Interpretive Report stated that certain validity indicators suggested Mr. S. may not have answered completely forthrightly and had exaggerated certain problems. Tr. 457. It further stated that Mr. S. portrayed himself in an especially negative or pathological manner, that "[s]ome deliberate distortion of the clinical picture appears to have occurred," and that his responses should be reviewed to evaluate the possibility of malingering. *Id*. The report concluded: "Regardless of the cause, THE TEST RESULTS ARE LIKELY TO CONTAIN CONSIDERABLE DISTORTION AND ARE UNLIKELY TO BE AN ACCURATE REFLECTION OF THE RESPONDENT'S OBJECTIVE CLINICAL STATUS." *Id*. But the report also identified alternative explanations for the results, including a cry for help or an exaggerated negative evaluation of himself and his life. *Id*. Elsewhere, it identified confusion, reading difficulties, random responding, idiosyncratic interpretations of test items, and failure to follow instructions as possible explanations for unusual responses. *Id*.

Mr. S. argues the PAI Clinical Interpretive Report does not constitute affirmative evidence of malingering because it was automatically generated from the PAI's internal validity testing rather than reflecting Dr. Genthe's own clinical findings. He emphasizes that the report itself identified numerous possible explanations for the unusual responses other than malingering and that Dr. Genthe separately described Mr. S. as "relatively genuine in his responses" and "interested

in doing his best." Tr. 455.

The Commissioner responds that the PAI Clinical Interpretive Report was included in the evaluation Dr. Genthe signed and that Dr. Genthe did not disavow its validity findings. The Commissioner also points to Dr. Genthe's separate conclusion that the PAI response pattern did not provide sufficiently valid data to accurately determine Mr. S.'s personality traits or psychological state and that further assessment or reevaluation might be necessary.

In reply, Mr. S. argues that Dr. Genthe merely acknowledged that the PAI results were invalid, not that they reflected malingering, and that the PAI Clinical Interpretive Report itself identified malingering as only one possible explanation for the results.

The Court agrees with Mr. S. The PAI Clinical Interpretive Report certainly raises concerns about the reliability of Mr. S.'s responses. But it does not identify malingering as the cause of those concerns. Rather, it directs the evaluator to consider the "possibility of malingering" while expressly identifying alternative explanations for the response pattern. Tr. 457. Its ultimate conclusion is similarly limited: regardless of the cause, the test results were likely distorted and did not accurately reflect Mr. S.'s clinical status. *Id*. Thus, the PAI established that its results were unreliable, but did not determine why they were unreliable.

Dr. Genthe likewise did not attribute the invalid PAI results to malingering. In his "Summary and Conclusions," he stated that Mr. S.'s response pattern "did

not provide sufficient valid data to accurately determine his personality traits or psychological state" and that further assessment or reevaluation might be necessary. Tr. 454. He did not conclude Mr. S. deliberately distorted his responses or was malingering. His clinical observations instead described Mr. S. as "relatively genuine in his responses," attentive, and interested in doing his best. Tr. 455.

The Commissioner argues that the PAI Clinical Interpretive Report should be treated as part of Dr. Genthe's own evaluation because it appeared in the report he signed and because Dr. Genthe separately acknowledged that the PAI response pattern was invalid and might require reevaluation. But neither point establishes Dr. Genthe attributed the invalid results to malingering.

At most, the PAI evidence establishes that Mr. S.'s responses were unreliable or distorted. Because the PAI Clinical Interpretive Report identified several possible causes for the invalid results and Dr. Genthe did not attribute those results to malingering, the record does not contain affirmative evidence suggesting malingering. Accordingly, the specific, clear, and convincing standard applies.

### c. Specific, Clear, and Convincing Standard Application

Mr. S. next contends the ALJ relied on four rationales to discount his symptom testimony: (1) limited engagement in treatment, (2) improvement with treatment, (3) the situational nature of his complaints, and (4) mental status examinations that the ALJ found inconsistent with the degree of limitation alleged.

He argues that none provides a specific, clear, and convincing reason for discounting his testimony. Each rationale is discussed in turn.

i. Limited Engagement with Treatment

Mr. S. first challenges the ALJ's reliance on his "minimal engagement in treatment." Tr. 39. In support of that finding, the ALJ noted that Mr. S. was discharged from behavioral-health services in October 2024 after having no contact since August 2024. *Id*. The ALJ also acknowledged Mr. S.'s testimony that he stopped counseling because it brought back bad memories, but found that explanation inconsistent with a treatment record stating that he planned to return in two weeks for follow-up. *Id*.

Mr. S. argues that the record was not fully developed and that, in any event, the ALJ failed to consider his reasons for inconsistent treatment, including homelessness, transportation and telephone difficulties, legal issues, and symptoms that themselves interfered with treatment. He also points to his testimony that counseling caused him to revisit traumatic memories. The Commissioner does not separately defend the ALJ's reliance on minimal treatment.

Mr. S.'s first argument fails for the reasons already discussed. The ALJ was not required to develop the record further. His second argument, however, is persuasive. An ALJ may consider treatment that is inconsistent with the alleged severity of a claimant's symptoms, but may not discount symptoms on that basis without considering possible reasons the claimant did not seek or continue

treatment. SSR 16-3p, 2016 WL 1119029, at *8-*9 ("We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."). The Ninth Circuit has likewise cautioned against drawing adverse inferences from a mentally impaired claimant's failure to seek treatment. *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299-300 (9th Cir. 1999); *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996).

Here, the record contains several explanations for Mr. S.'s limited treatment. He testified that he stopped counseling because discussing his past brought back painful memories. Tr. 76. Treatment records likewise show that he reported a history of giving up on counseling when he became frustrated or encountered a roadblock, Tr. 620, and identified pushing people away, isolating, not discussing his problems, and becoming tired and giving up as barriers to treatment. Tr. 630. Providers also documented difficulty maintaining telephone contact with him. *See, e.g.*, Tr. 391, 642. And a later disability report stated that Mr. S. stopped treatment because he felt hopeless, lacked motivation, and did not believe treatment was helping. Tr. 317, 320. The broader treatment history also documents recurring barriers from homelessness, transportation difficulties, and incarceration. *See, e.g.*, Tr. 360, 381, 464.

The ALJ did not meaningfully address these explanations. Although the ALJ

acknowledged Mr. S.'s testimony that he stopped counseling because it brought back bad memories, the ALJ found that explanation inconsistent with a record showing that he planned to return in two weeks for follow-up. Tr. 39. But the cited record concerned a medication-management follow-up, not counseling. Tr. 659. An intent to continue medication management does not contradict Mr. S.'s explanation for discontinuing counseling because discussing past trauma was distressing.

Moreover, the Commissioner does not respond to Mr. S.'s specific challenge to the ALJ's minimal treatment rationale. A party's failure to respond to an argument may permit the Court to treat the opposing party's contention as conceded. *See Hunt v. Colvin*, 954 F. Supp. 2d 1181, 1196 (W.D. Wash. 2013) (construing Defendant's failure to respond to an argument as a concession that the plaintiff's argument has merit and finding the "Court will not manufacture a defense on the Commissioner's behalf where Plaintiff has identified an at least plausible error"); *Pamela S. v. Bisignano*, 2025 WL 2399145, at *4 (E.D. Wash. Aug. 18, 2025) ("If a party fails to counter an argument that the opposing party makes, the Court may treat that argument as conceded."). Regardless, the rationale also fails on the merits. Because the ALJ did not adequately consider the documented explanations for Mr. S.'s inconsistent treatment, his limited engagement in treatment was not a specific, clear, and convincing reason for discounting his symptom testimony.

ii. Improvement with Treatment

Mr. S. next challenges the ALJ's finding that his treatment was helpful when he engaged in it. Tr. 39. In support of that finding, the ALJ noted that Mr. S. reported feeling better in June 2023 and, during PMHNP Crane's June 2024 evaluation, stated that mental health treatment had been helpful. Tr. 38-39. The ALJ concluded that these reports of improvement undermined the degree of limitation Mr. S. alleged. *Id*.

Mr. S. argues that any improvement must be considered in the context of the overall diagnostic picture and that the record does not show significant or sustained improvement in his mental health symptoms. He points principally to records from spring 2024 showing continued depression and anxiety despite treatment and to PMHNP Crane's June 2024 evaluation documenting ongoing psychiatric symptoms and cognitive difficulties. The Commissioner does not separately defend the ALJ's reliance on improvement with treatment.

A claimant's improvement with treatment is a relevant consideration, but reports of improvement in the mental-health context must be viewed in light of the claimant's overall diagnostic picture. *Ghanim*, 763 F.3d at 1164. Likewise, an ALJ may not isolate periods of improvement from a record reflecting ongoing symptoms, because some improvement does not necessarily establish an ability to function effectively in the workplace. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014).

Here, the ALJ relied on Mr. S.'s statement during PMHNP Crane's June 2024 evaluation that he found mental health treatment helpful. Tr. 39. But Mr. S. reported only that treatment had "helped somewhat." Tr. 645. The same evaluation documented continuing anxiety, depression, low energy and motivation, nightmares, intrusive thoughts, hypervigilance, flashbacks, anger, and attention problems. Tr. 644-45. It also documented circumstantial speech, difficulty following the conversation, impaired delayed recall, mildly impaired abstract thinking, and poor judgment. Tr. 646.

The contemporaneous treatment records likewise do not show sustained improvement. In March 2024, Mr. S. continued to report depression and was started on psychiatric medication. Tr. 633. The following month, he remained depressed and reported increased anxiety, prompting further medication adjustments. Tr. 659.

The ALJ also cited a June 2023 report that Mr. S. was feeling "a lot better." Tr. 38, 551. But that record expressly attributed his improved mood to progress obtaining public benefits and housing, not to mental health treatment. Tr. 551. It therefore provides little support for the ALJ's conclusion that improvement with treatment undermined Mr. S.'s allegations.

The Commissioner does not separately defend this rationale, effectively conceding Mr. S.'s challenge. Nevertheless, viewed in context, Mr. S.'s reports of some improvement do not establish sustained improvement inconsistent with the

severity of the symptoms he alleged. The ALJ's reliance on improvement with treatment therefore was not a specific, clear, and convincing reason for discounting Mr. S.'s symptom testimony.

iii. Situational stressors

Mr. S. next challenges the ALJ's reliance on the situational nature of his mental health complaints. The ALJ noted that Mr. S. reported depression related to separation from his children in March and April 2024 and attributed his psychiatric problems to money problems and homelessness during PMHNP Crane's June 2024 evaluation. Tr. 38-39. The ALJ also found that the treatment records showed Mr. S. primarily complained of current situational stressors rather than reexperiencing past trauma and concluded that he "largely" endorsed mental health complaints due to situational stressors. Tr. 39.

Mr. S. argues the record does not establish that his limitations were primarily attributable to situational stressors rather than his underlying mental impairments. In support, he relies on *Wright v. Colvin*, 2014 WL 3729142, at *5 (E.D. Wash. July 25, 2014) and *Brendan J.G. v. Comm'r, Soc. Sec. Admin.*, 2018 WL 3090200, at *7 (D. Or. June 20, 2018). The Commissioner responds that the ALJ reasonably found Mr. S.'s limitations were not persistent but instead related to situational stressors. In reply, Mr. S. argues that the Commissioner merely repeats the ALJ's conclusion without addressing his challenge to the underlying reasoning.

The cases Mr. S. cites support his argument and are persuasive. Evidence that a claimant experiences significant situational stressors does not necessarily establish that those stressors, rather than an underlying mental impairment, account for the symptoms or limitations alleged. *See Wright*, 2014 WL 3729142, at *5 (upholding reliance on situational stressors where the claimant acknowledged that the stress of caring for family members, rather than a specific mental impairment, was the primary obstacle to maintaining full-time employment); *see also Brendan J.G. v. Comm'r, Soc. Sec. Admin.*, 2018 WL 3090200, at *7 (explaining that the contemporaneous occurrence of mental health symptoms and life stressors, without more, does not establish that the stressors caused the symptoms).

Here, the record supports the ALJ's observation that situational stressors contributed to some of Mr. S.'s symptoms. But the ALJ did not adequately explain why that fact undermined the severity or persistence of the limitations he alleged. In March 2024, Mr. S.'s provider acknowledged that his separation from his children was a situational problem, but also concluded that he met the criteria for depressive disorder and started psychiatric medication. Tr. 633. The following month, Mr. S. remained depressed and reported increased anxiety, prompting the provider to increase his medications and add another medication for anxiety. Tr. 659. Thus, the treatment records do not establish that the situational nature of some of Mr. S.'s stressors displaced his underlying mental impairments as the source of his alleged limitations.

Likewise, although Mr. S. told PMHNP Crane that he attributed his psychiatric problems to money problems and homelessness, the ALJ characterized those problems as arising from situational stressors “rather than . . . medical conditions.” Tr. 39. But PMHNP Crane did not make that distinction. She diagnosed bipolar II disorder, PTSD, and generalized anxiety disorder, described Mr. S.’s prognosis for improvement as guarded, and opined that a work setting could have a “major negative impact” on his condition. Tr. 647. Her evaluation also documented continuing anxiety, depression, nightmares, intrusive thoughts, hypervigilance, and flashbacks. Tr. 644-45.

The record therefore establishes that situational stressors contributed to Mr. S.’s symptoms, but not that those stressors, rather than his diagnosed mental impairments, accounted for the limitations he alleged. The ALJ’s reliance on situational stressors was therefore not a specific, clear, and convincing reason for discounting Mr. S.’s symptom testimony.

iv. Objective medical evidence

Finally, Mr. S. challenges the ALJ’s reliance on examination findings that the ALJ found inconsistent with the degree of limitation alleged. The ALJ cited observations that Mr. S. was well groomed, cooperative, friendly, attentive, and oriented, as well as findings of generally normal speech, mood and affect, memory, concentration, thought processes, and fund of knowledge. Tr. 38-39. The ALJ ultimately concluded that Mr. S. was generally pleasant, alert, oriented, and

cooperative and could maintain adequate attention and concentration during appointments. Tr. 39.

Mr. S. contends objective evidence cannot, standing alone, support discounting his symptom testimony and that the ALJ overlooked numerous abnormal findings. The Commissioner responds that the ALJ reasonably relied on examination findings that were inconsistent with the degree of limitation Mr. S. alleged. In reply, Mr. S. maintains that the record does not support the ALJ's characterization of his mental status examinations as generally normal.

An ALJ may not discount a claimant's symptoms solely because the objective medical evidence does not fully corroborate the alleged severity of those symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc); *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022). Objective medical evidence that actually contradicts a claimant's testimony, however, may provide a specific, clear, and convincing reason for discounting that testimony. *Smartt*, 53 F.4th at 498-99. The ALJ must identify the testimony being discounted and explain how the cited evidence undermines it. *See Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020); *see also Ortiz v. Bisignano*, 179 F.4th 691, 705-06 (9th Cir. 2026) (requiring the ALJ to rely on record evidence that undermines the symptom at issue, rather than evidence concerning other symptoms).

Here, the ALJ relied on several normal findings from Mr. S.'s mental status examinations to conclude that his functioning was inconsistent with the degree of

limitation he alleged. Dr. Genthe observed that Mr. S. was well groomed, cooperative, friendly, and attentive and successfully completed several memory and concentration tasks. Tr. 38, 455-56. In June 2023, his speech, affect, and behavior were within normal limits and he tracked the conversation appropriately. Tr. 38, 551. Mental status examinations in March and April 2024 also contained largely normal findings. Tr. 38, 635-37, 662-63. And PMHNP Crane observed that Mr. S. was well groomed, cooperative, pleasant, fully oriented, and able to perform several concentration tasks. Tr. 39, 646.

But some of those same examinations also contained significant abnormal findings that the ALJ did not meaningfully account for in reaching that conclusion. Dr. Genthe documented dysphoric affect, depression- and anxiety-related preoccupations, tangential and circumstantial thought processes, significant difficulty following the conversation, and abnormalities in memory, fund of knowledge, calculation, abstract thinking, and insight. Tr. 455-56. Crane likewise documented auditory hallucinations, circumstantial speech, difficulty following the conversation, impaired delayed recall, errors on serial sevens, mildly impaired abstract thinking, poor judgment, mildly impaired concentration and persistence, and moderate distractibility or fatigue. Tr. 646-47. Other treatment records also documented intermittent anxiety, depression, abnormal speech and thought processes, hallucinations, and distractibility. *See, e.g.*, Tr. 382, 392, 405, 515, 540. Although the ALJ acknowledged some impairment in memory and concentration

and noted that Mr. S. was circumstantial at times, Tr. 38-39, he did not meaningfully account for the broader abnormal findings in concluding that the examinations were inconsistent with the degree of limitation alleged.

The ALJ did not adequately explain why the mental status examinations were inconsistent with the degree of limitation Mr. S. alleged. Although the examinations contained some normal findings, they also documented significant abnormalities bearing on the same areas of functioning. And because the ALJ's other reasons for discounting Mr. S.'s symptom testimony are insufficient, the objective medical evidence cannot independently sustain the ALJ's determination. *See Bunnell*, 947 F.2d at 345; *Smartt*, 53 F.4th at 498. The ALJ's reliance on the objective medical evidence therefore was not a specific, clear, and convincing reason for discounting Mr. S.'s symptom testimony.

All considered, the ALJ failed to give specific, clear, and convincing reasons for discounting Mr. S.'s symptom testimony. This matter must be remanded for reconsideration of Mr. S.'s symptom testimony.

Because the ALJ's assessment of the medical opinion evidence depends at least in part on reevaluation of Mr. S.'s symptom claims, the Court declines to address Mr. S's arguments about the ALJ's evaluation of the medical opinion evidence. The medical opinions shall also be reconsidered on remand.

## CONCLUSION

For the reasons stated above, the ALJ's final decision is REVERSED and REMANDED for further proceedings consistent with this opinion. On remand, the ALJ shall address the errors set forth herein, offer the opportunity for a hearing, develop the record as necessary, reconsider the record, conduct a new sequential evaluation, and issue a new decision.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's Brief, **ECF No. 7**, is **GRANTED**.
2. Defendant's Brief, **ECF No. 9**, is **DENIED**.
3. This case is **REVERSED** and **REMANDED** for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS SO ORDERED**. The District Court Clerk is directed to enter this Order and provide copies to counsel. Judgment shall be entered for Plaintiff and the file shall be **CLOSED**.

**DATED** August 26, 2026.

REBECCA L. PENNELL
United States District Judge